ESTATE OF ALVIN THALHEIMER, RUTH B. ROSENBERG, SURVIVING EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ESTATE OF HENRIETTA G. BLAUSTEIN, HILDA K. BLAUSTEIN AND RUTH B. ROSENBERG, SURVIVING EXECUTRICES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Thalheimer v. Commissioner
Docket Nos. 5684-69, 1661-70.
United States Tax Court
T.C. Memo 1974-203; 1974 Tax Ct. Memo LEXIS 114; 33 T.C.M. (CCH) 877; T.C.M. (RIA) 74203; August 5, 1974, Filed. John S. McDaniel, Jr. and Lawrence A. Kaufman, for the petitioners. Arnold E. Kaufman, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION
GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal estate taxes as follows: Petitioner
Docket
Date of
Estate Tax
No.
Death
Deficiency Estate of Alvin Thalheimer, Ruth B.
5684-69
7/8/65
$1,967,884.83
Rosenberg, Surviving Executrix
Estate of Henrietta G. Blaustein, Hilda
1661-70
12/8/65
1,302,201.32
K. Blaustein and Ruth B. Rosenberg,
Surviving Executrices
The cases were consolidated for trial, *115 briefs and opinion. Certain adjustments made by the Commissioner have either been conceded or were not raised by the petitioners. The only issue for decision is the valuation of certain classes of stock of a closely held family corporation which each decedent owned at death. FINDING OF FACT Jacob Blaustein, a legal resident of Baltimore County, Maryland, and Ruth B. Rosenberg, a legal resident of Baltimore City, Maryland, were the duly appointed executors of the estate of Alvin Thalheimer, deceased, (hereinafter referred to as Dr. Thalheimer), the petitioner in docket No. 5684-69, on the date they filed the petition in such case. Doctor Thalheimer died on July 8, 1965, a resident of Baltimore City, Maryland, and the Federal estate tax return for his estate was filed with the district director of internal revenue at Baltimore, Maryland. Jacob Blaustein and Ruth B. Rosenberg were the duly appointed executors of the estate of Henrietta G. Blaustein, deceased (hereinafter referred to as Mrs. Blaustein), the petitioner in docket No. 1661-70, on the date they filed the petition in such case. Mrs. Blaustein died on December 8, 1965, a resident of Baltimore City, Maryland, and *116 the Federal estate tax return for her estate was filed with the district director of internal revenue, Baltimore, Maryland. Jacob Blaustein died on November 15, 1970. In accordance with the provisions of Dr. Thalheimer's last will and testament, no successor was appointed to Mr. Blaustein as an executor of Dr. Thalheimer's estate, and Mrs. Rosenberg is the surviving executrix of such estate. In accordance with the provisions of Mrs. Blaustein's last will and testament, Hilda K. Blaustein, a legal resident of Baltimore County, Maryland, was appointed as the successor to Mr. Blaustein as an executrix of Mrs. Blaustein's estate, and Mrs. Hilda Blaustein and Mrs. Rosenberg are the executrices of such estate. At the time of his death, Dr. Thalheimer was a widower and was survived by a son and three grandchildren. His wife, Fanny Blaustein Thalheimer, died in 1957. She was a daughter of the late Louis Blaustein. At the time of his death, Dr. Thalheimer was the first vice president and a director of American Trading and Production Corp., a Maryland corporation, hereinafter referred to as "ATAPCO," and owned the following shares of capital stock of ATAPCO, all of which he had inherited *117 from his wife: Class of Stock
Number of Shares
Percent of
Total Shares
Oustanding 5% Cumulative Class B First Preferred
666
.57%
6% Cumulative Second Preferred
3,779
.96%
Class A Common
15,367
8.29%
Class B Common
28,745
5.31%
The Federal estate tax liability of the estate of Fanny B. Thalheimer was settled on fair market values of preferred and common stock of ATAPCO at $10 per share and $60 per share, respectively. Mrs. Blaustein was the widow of the late Louis Blaustein, who died in 1937, and she was survived by two children, seven grandchildren and nineteen great-grandchildren (hereinafter collectively called the "Louis Blaustein descendants"). At the time of her death, Mrs. Blaustein owned the following shares of capital stock of ATAPCO: Class of Stock
Number of Shares
Percent of
Total Shares
Outstanding 5% Cumulative Class B First Preferred
3,071
2.64%
6% Cumulative Second Preferred
1,866
.48%
Class A Common
9,700
5.23%
Class B Common
29,100
5.37%
Louis Blaustein and his son, Jacob Blaustein, were the founders of the business known as the American Oil Co., which was engaged in selling *118 gasoline, kerosene and other petroleum products. The American Oil Co. originated in Baltimore, Maryland, and gradually expanded throughout the entire eastern part of the United States. Under the Blausteins' direction, it was the originator of many new ideas in the marketing of gasoline, such as the drive-in gasoline service station and premium motor fuel. Prior to 1921, the Blausteins conducted their business as a partnership. In 1921, they transferred some of the assets (primarily gasoline service stations) to Lord Baltimore Filling Stations, Inc. (hereinafter called Lord Baltimore) in exchange for all of its capital stock, and, in 1922, they transferred all of the other assets to the American Oil Co. in exchange for all of its capital stock. These corporations did not have refineries, crude production or bulk transportation facilities, and the entire supply of gasoline was purchased from Standard Oil Co. of New Jersey (hereinafter called Jersey) which was American's largest competitor, under a contract with an expiration date of December 31, 1923. In 1923, Louis and Jacob Blaustein sold 50 percent of the stock of American Oil and Lord Baltimore to Pan American Petroleum *119 and Transport Co. (hereinafter referred to as Pan Am), which was independent of the Standard Oil Companies and which, directly and through subsidiaries, had large crude oil reserves, three large refineries and extensive transportation facilities, but lacked sales outlets and marketing facilities. In connection with this stock sale, a broad spectrum of agreements were entered into, providing for the management and operation of American Oil and Lord Baltimore including an agreement that a Pan Am subsidiary would supply all of American Oil's gasoline requirements for a period of ten years expiring on December 31, 1933, an agreement that the Blausteins would elect one-half of the directors of American Oil and Lord Baltimore, who, in turn, would elect two members of the executive committee and the president, the first vice president and general manager and the second vice president of each corporation, with the other directors and officers being elected by Pan Am, and an agreement on further sales of the stock. In accordance with these agreements, Louis Blaustein served as president and Jacob Blaustein served as first vice president and general manager of American Oil and Lord Baltimore. *120 During the period from 1923 to 1930, Standard Oil Co. of Indiana (hereinafter called Indiana), which had certain common stockholders with Jersey, acquired more than 95 percent of the stock of Pan Am and thereby indirectly became empowered to control the exercise of Pan Am's rights with respect to American Oil and Lord Baltimore. In 1930, disputes arose between the Blausteins and Pan Am regarding the contract under which American Oil was buying its requirements of gasoline, and Pan Am threatened to stop supplying American Oil. These disputes intensified during 1931 and 1932. Additionally, the Blausteins learned in 1931 that Indiana proposed to transfer all of Pan Am's crude oil and refining properties to Jersey in exchange for Jersey stock, which would have ended Pan Am's availability as a source of supply of gasoline for American Oil. In early 1930, the Blausteins made efforts to have American Oil acquire Crown Central Petroleum Corp. (hereinafter called Crown) from which American Oil had been buying a special gasoline concentrate for blending purposes and which owned refining facilities which, with a substantial expenditure of money, could have been expanded and improved *121 to meet American Oil's requirements. In April 1930, the Blausteins obtained, on behalf of American Oil, an option to acquire a controlling interest in Crown. Pan Am refused to permit American Oil to exercise this option, and in November 1930, the Blausteins acquired an interest in Crown for their own account. After acquiring the interest in Crown, the Blausteins considered what means were available to raise the necessary funds to equip Crown to supply American Oil's requirements, and determined that the most feasible plan was to form a new corporation which would hold the interest in Crown plus sufficient stock of American Oil and Lord Baltimore to enable it to sell debentures or preferred stock in the territory in which American Oil and Lord Baltimore were favorably known. ATAPCO was organized for this purpose, and, in June 1931, the Blausteins transferred approximately one-half of their American Oil and Lord Baltimore stock and all of their Crown securities to ATAPCO in exchange for all of its stock. Following the incorporation of ATAPCO, there were, concurrently, continuing studies with respect to the financing and planning of the improvement of the Crown refinery and negotiations *122 with Indiana as to the establishment of a new corporation which would have not only the marketing business of American Oil and Lord Baltimore, but also would have refining capacity and a supply of crude oil. These negotiations with Indiana ultimately resulted in an agreement between the Blausteins and ATAPCO, on the one hand, and Indiana on the other hand, that Pan Am, American Oil and Lord Baltimore would be reorganized to form a complete unit in the oil business, with a refinery, crude supplies and marketing facilities. The agreement provided, among other things, that ATAPCO and the Blausteins would exchange their American Oil and Lord Baltimore stock for Pan Am stock, that for a minimum of four years Louis Blaustein would be president of Pan Am and chairman of the board of American Oil and Jacob Blaustein would be first vice president of Pan Am and president of American Oil, during which period the Blausteins would manage and direct all marketing operations, and that so long as the Blausteins and ATAPCO continued to hold certain specified quantities of Pan Am stock, they would be entitled to specified representations on the boards of directors and executive committees of Pan Am *123 and its subsidiaries, including American Oil and Lord Baltimore. While the consummation of this agreement with Indiana made it unnecessary to develop Crown as a supply source for American Oil, the projected program for reconstructing and expanding Crown's refining facilities had proceeded to the point where a loss would be incurred if the program were completely terminated, and Crown proceeded with a more limited expansion and improvement of its refining facilities. Thereafter, Crown proceeded to develop and expand its business as an independent refiner and marketer of petroleum products. In 1965, Crown had refining and petrochemical facilities located on the Houston Ship Channel, interests in various pipelines, proven oil and gas leases in Texas, Louisiana, Mississippi and Pennsylvania, and it marketed petroleum products at wholesale and retail in the States of Connecticut, New York, New Jersey, Pennsylvania, Maryland, Virginia, West Virginia, North and South Carolina, Georgia, Alabama, Florida and Texas. Crown's refinery in 1965 was comprised primarily of a 33,000 B/D crude unit (installed in 1936 and subsequently modified) and downstream processing equipment consisting of *124 two TCC units with an aggregate capacity of 24,000 B/D (built during World War II), an 8,500 B/D reformer (built in 1954), a 5,400 B/D Udex unit (built in 1961) and a 3,800 B/D alkylation unit (built in 1965). Crown's refinery had insufficient capacity to meet its marketing requirements. The crude unit was incapable of further expansion and the TCC units were obsolete and incapable of modification to take advantage of new techniques. Crown had high labor costs and difficulty with maintenance, and the total yield of its refinery was below industry averages. Because of these inadequacies, Crown planned either to replace the crude unit or build a companion unit, to replace the TCC units and to build other downstream units. The original estimated cost was $36,000,000. This work was started in 1968 and completed in 1969 to 1970 at a total cost of $46,000,000 which was financed by the issuance of convertible debentures, a mortgage loan and bank borrowings. The following table shows Crown's gross operating income, net income and book equity at the end of the year, for each of the years 1961 to 1965: 1961
1962
1963 Gross Operating income
$66,410,463
$72,067,039,
$77,650,051
Net Income
635,988
827,663
793,741
book Equity(End of Year)
20,954,815
21,574,624
22,094,736
*125 1964
1965 Gross Operating Income
$70,298,943
$70,694,840
Net Income
465,784
1,509,662
Book Equity (End of Year)
22,354,384
23,575,226 $ TIn 1965, Crown had 824,978 shares of common stock outstanding, of which 402,851 shares (approximately 48.8 percent of the total) were held by ATAPCO. Two officer-directors of Crown (Henry A. Rosenberg, Jr., administrative vice president and acting president, and John W. Cable, III, general counsel) were directors of ATAPCO. John W. Cable, III, was also a partner in the law firm of Cable & McDaniel, which was general counsel for ATAPCO. L. C. Dunbar, a vice president and director of ATAPCO, and John S. McDaniel, Jr., a partner in the law firm of Cable & McDaniel, were also directors of Crown. The Crown common stock is listed on the American Stock Exchange which is a national securities exchange as defined in the Securities Exchange Act of 1934. On July 8, 1965, the high and low prices of the Crown stock on such exchange were 12-5/8. On December 8, 1965, the high and low prices and the mean of such high and low were 14, 13-3/4 and 13-7/8, respectively. During the year 1965, the price of Crown common stock varied *126 between a low of 12 and a high of 15-1/4, the number of shares traded in each month varied from a low of 2,100 shares to a high of 12,300 and a total of 59,900 shares were traded. ATAPCO's basis for determining gain or loss on a sale of the Crown common stock it owned was $624,579 and throughout 1965 such stock was carried as an asset on its balance sheet in the amount of $624,579. Almost immediately following the execution of the 1933 Agreement with Indiana, further disputes arose between the Blausteins and Indiana because of the failure by Indiana fully to carry out the terms of the agreement. In particular, the refinery which was built was only one-half the size stated in the Agreement and the construction of additional refining equipment was not started for almost two years; the commencement of the program for the acquisition of the crude properties was delayed until 1935; and Indiana refused to permit Pan Am to construct its own pipeline system and required it to use pipelines of Indiana and Jersey and their subsidiaries. In January 1937, the Blausteins and ATAPCO instituted a derivative suit in the Supreme Court of the State of New York on behalf of Pan Am and all of its *127 stockholders against Indiana, Jersey and various of their officers and directors, alleging that the defendants had conducted Pan Am's business for the benefit of Indiana and Jersey to the detriment of Pan Am and its other stockholders. This suit was decided in favor of the Blausteins and ATAPCO against Indiana by the Supreme Court of New York in June 1940. This decision was reversed by the Appellate Division in February 1942, and the reversal was upheld by the Court of Appeals of New York in July 1944. Thereafter, in April 1945, the Blausteins and ATAPCO instituted a suit in the Superior Court of the State of Delaware against Indiana for breach of the 1933 Agreement. The litigation with Indiana was finally terminated in 1954 by an agreement that Pan Am would be merged into Indiana. The merger was consummated on August 17, 1954, at which time ATAPCO received 520,843 shares of capital stock of Indiana in exchange for the 670,325 shares of common stock of Pan Am then owned by it. The number of shares of Indiana stock held by ATAPCO was subsequently increased by a 100 percent stock dividend in 1954 and a two-for-one split in 1964 to 2,083,372 shares, which was the number of shares *128 held by ATAPCO throughout 1965. Although the Blausteins had, in 1937, ceased to be officers of Pan Am and American Oil and the related companies because of the litigation which was initiated in that year, they (and particularly Jacob Blaustein, following the death of his father) continued as directors and in other capacities and continuously participated in decisions in those areas where it was possible to reach decisions which would mutually benefit Indiana and the other stockholders of Pan Am, including the Blausteins. Following the merger of Pan Am into Indiana in 1954, Jacob Blaustein became a director of Indiana, and he continuously participated in its management decisions, including, especially, those in respect of which his status as the president of ATAPCO (the largest single stockholder of Indiana), and as a very substantial stockholder of Indiana individually and as a trustee of several trusts holding stock in Indiana, might result in other stockholders of Indiana adhering to his conclusions that such decisions were in the best interests of the stockholders of Indiana. In this connection, Mr. Blaustein became a member of various committees of the board of directors of *129 Indiana. The involvement of Jacob Blaustein in the management of Indiana resulted in his having knowledge of actual and proposed decisions by the management of Indiana prior to the time information was furnished to the investing public. While ATAPCO was free to dispose of the Indiana stock, because of Mr. Blaustein's relationship it would have had to make a full disclosure of any "insider's information" to a purchaser. In 1965, Indiana had outstanding 70,794,742 shares of capital stock, of which 2,083,372 shares (approximately 2.94 percent of the total) was owned by ATAPCO. An additional 732,256 shares (approximately 1.03 percent) of Indiana capital stock was held by the Blaustein family. The Indiana capital stock is listed on the New York Stock Exchange, the Midwest Stock Exchange, and the Pacific Coast Stock Exchange, each of which is a national securities exchange as defined in the Securities Exchange Act of 1934. A total of 3,608,888 shares were traded on these exchanges in 1965. The shares owned by ATAPCO were equal to approximately 67 percent of the 1965 trading volume on the New York Stock Exchange and approximately 57 percent of the 1965 trading volume on all such *130 exchanges and exceeded the total volume on all such exchanges in the last half of 1965. Distribution of the shares of Indiana stock held by ATAPCO would have required registration under the Securities Act of 1933 or, in the absence of registration, would have required an investment representation by the purchasers. On July 8, 1965, the high and low prices and the mean of such high and low prices for the Indiana stock on the New York Stock Exchange were 47-3/4, 46-3/8 and 47-1/16, respectively. On December 8, 1965, the high and low prices and the mean of such high and low prices for the Indiana stock on the New York Stock Exchange were 47, 46-1/2 and 46-3/4, respectively. ATAPCO's basis for determining gain or loss on a sale of the Indiana capital stock was $939,823 and throughout 1965 such stock was carried as an asset on the balance sheet of ATAPCO in the amount of $5,834,530. From time to time, Indiana, which had acquired a large quantity of Jersey capital stock in 1932 in connection with a sale of certain assets, distributed shares of capital stock of Jersey as a dividend. In 1965, ATAPCO held 148,159 shares of capital stock of Jersey out of a total of 215,426,435. The *131 Jersey capital stock is listed on the New York Stock Exchange. On July 8, 1965, the high and low prices and the mean of such high and low prices for the Jersey stock on such exchange were 77, 76-1/8 and 76-9/16, respectively. On December 8, 1965, the high and low prices and the mean of such high and low prices for the Jersey stock on such exchange were 79-1/8, 78-3/8 and 78-3/4, respectively. During the year 1965, the trading volume was 6,983,300 shares and the prices for Jersey stock varied between a low of 73-5/8 and a high of 90-3/4. There were no relationships between ATAPCO, Jacob Blaustein or any of ATAPCO's associates which would have restricted a sale by ATAPCO of the Jersey capital stock. The size of ATAPCO's holding of Jersey stock relative to total shares could have been absorbed in the market within a reasonable time without a significant effect on the market price. ATAPCO's basis for determining gain or loss on a sale of the Jersey capital stock owned by it in 1965 was $3,272,343 and such stock was carried as an asset on the balance sheet of ATAPCO in the amount of $7,304,633 as of December 31, 1964, and of $7,374,147 as of December 31, 1965. In 1965, ATAPCO *132 owned 28,710 shares of capital stock of Union Trust Company of Maryland (hereinafter called Union Trust), which was approximately 4.97 percent of the total of 578,000 shares of capital stock of Union Trust outstanding in 1965. Union Trust conducted a general banking and trust business in Baltimore and other parts of Maryland in 1965. The stock of Union Trust was registered under the Securities Exchange Act of 1934. Jacob Blaustein, the president and a director of ATAPCO, and Morton K. Blaustein, a vice president, the treasurer and a director of ATAPCO, were each directors of Union Trust throughout 1965, and were members of various committees of the board of directors of Union Trust, and had knowledge of actual and proposed decisions by the management of Union Trust prior to the time information was furnished to the investing public. ATAPCO, Jacob Blaustein, Morton K. Blaustein, Hilda K. Blaustein (the wife of Jacob Blaustein and mother of Morton K. Blaustein), Barbara B. Hirschhorn and Elizabeth B. Roswell (daughters of Jacob Blaustein and sisters of Morton K. Blaustein), other relatives of Jacob and Morton K. Blaustein and trusts and estates of which Jacob Blaustein was a fiduciary *133 owned in the aggregate in excess of 10 percent of the issued and outstanding capital stock of Union Trust. The capital stock of Union Trust is not listed on any stock exchange, but instead is bought and sold on the "over-the-counter" market, and there is no published record of sales and purchases. Records are maintained by Union Trust showing the number of shares transferred from time to time from the name of one record holder to the name of another record holder. Approximately one-half of the transfers involved sales and purchases and the other one-half involved other types of transactions, such as transfers from decedents to legatees. In some instances, a sale and a purchase will involve two transfers; i.e., an investment firm will acquire stock from a seller, have such stock transferred to its name and then resell such stock to a purchaser. ATAPCO's basis for determining gain or loss on a sale of the Union Trust capital stock owned by it in 1965 was $673,405 and such stock was carried as an asset on the balance sheet of ATAPCO in the amount of $673,405. On July 8, 1965, the bid and asked prices and the mean of such prices for Union Trust capital stock were 62-1/2, 64 *134 and 63-1/4, respectively. On December 8, 1965, the bid and asked prices and the mean of such prices were 66-1/2, 67-1/2 and 67, respectively . In 1965, ATAPCO owned 4,641 shares of United States Fidelity & Guaranty Co., (hereinafter called U.S.F.&G.), including shares received as a stock dividend in 1965, or approximately .06 percent of the total 7,649,584 average shares outstanding during that year. U.S.F.&G. is engaged in writing substantially all kinds of insurance. The capital stock of U.S.F&G. was traded over the counter in 1965 and was not listed on any stock exchange. On July 8, 1965, the bid and asked prices and the mean of such bid and asked prices for the U.S.F.&G. stock were 56-1/4, 57 and 56-5/8, respectively. On December 8, 1965, the bid and asked prices and the mean of such bid and asked prices for the U.S.F.&G. stock were 64-1/8, 64-3/4 and 64-7/16, respectively. The shares owned by ATAPCO could have been sold without any material effect upon the market. ATAPCO's basis for determining gain or loss on a sale of the U.S.F.&G. capital stock owned by it in 1965 was $53,331 and such stock was carried as an asset on the balance sheet of ATAPCO in the amount of $53,331. *135 In 1965, in addition to its stock holdings in Crown, Indiana, Jersey, Union Trust and U.S.F.&G., ATAPCO had several operating divisions comprised of a Marine Division, an Oil and Gas Division, a Real Estate Division and a Manufacturing Division, which latter consisted of the Atlas Sound and the Kromex components. The Marine Division began business in 1938 with the acquisition of used oil tanker operated primarily in the transportation of petroleum products for Crown from its refinery near Houston, Texas, to its terminal at Elizabeth, New Jersey, but which was also operated for other purposes. After the end of World War II, ATAPCO expanded and diversified its marine transportation activities to include the transportation of crude oil, specialty chemical products, vegetable oils, molasses and grain. All of the vessels which ATAPCO acquired were used vessels when acquired, and it never built new vessels. However, in 1958, it did "jumboize" one vessel by having a larger midbody constructed and inserted in the middle of an existing vessel, and it, from time to time, made improvements to vessels which did not increase their size or carrying capacity. At the beginning of 1965, *136 ATAPCO's fleet consisted of five vessles, four of which had been built during World War II and one of which was the jumboized vessel which had been built during World War II and rebuilt in 1958. During 1965, one of these vessels was scrapped, another vessel (built during World War II) was acquired and at the end of 1965 one vessel was in the course of having its midbody removed and replaced with a midbody of the same size from another tanker which had been built during World War II. The jumboized vessel was subject to a Preferred Ship Mortgage, the unpaid principal balance of which was $1,533,770.73 on January 1 and July 8, 1965, and $1,359,619.73 on December 8 and 31, 1965. The vessels owned by ATAPCO in 1965 and their equipment were carried as assets on the balance sheet of ATAPCO at values equal to their costs less depreciation. Such values were $4,299,899.14 on June 30, 1965, and $4,309,202 on November 30, 1965, which amounts were the fair market values of the vessels and their equipment on July 8, 1965 and December 8, 1965, recpectively. During all of the years from 1938 through 1965, Crown chartered a vessel from ATAPCO which was used as the principal means of transporting *137 products from Crown's refinery to its terminal on the East Coast. In 1965, Crown made other arrangements for moving its products and supplying its terminals and after December 12, 1965, it ceased chartering vessels from ATAPCO. ATAPCO also chartered vessels (primarily through brokers) to subsidiaries of Indiana and Jersey from time to time. The revenue from these charters was only a small part of the revenues received by ATAPCO from the operation of its vessels and ATAPCO supplied only a minute part of the transportation requirements of Indiana, Jersey and their subsidiaries. ATAPCO was engaged in the exploration for and production of oil and gas since 1944. In 1965, it owned interests in producing oil and gas properties in Texas, New Mexico and Louisiana. In July 1965, a total of 93 oil and gas wells were in operation. A full working interest (i.e., the right to receive the entire production less only the royalties) was held in 36 wells, fractional parts of the working interests were held in 25 wells in which unrelated parties owned the balances of the working interest, and overriding royalties were held in 32 wells.Interests in approximately the same number of wells were *138 held by ATAPCO throughout 1965. ATAPCO also held interests in other oil and gas leases on which there were no producing wells. ATAPCO's interests in producing oil and gas wells and the related leases and equipment were included as assets on its balance sheet at values equal to total cost (including both costs of acquiring the lease and of drilling and equippping the well) less depreciation, depletion and amortization. ATAPCO's interests in oil and gas leases on which there were no producing wells were included as assets on its balance sheet at values equal to total costs, including any "bonuses" paid in connection with the acquisitions of the leases and other capital costs, such as costs for securing geological data for evaluation purposes. The amounts so included as assets in the balance sheet of ATAPCO were $7,870,377 as of June 30, 1965, and $7,762,205 as of December 31, 1965. At all times during 1965, the fair market values of the oil and gas properties owned by ATAPCO, including leases, wells and well and leasehold equipment, as an entirety was $4,000,000. At all relevant times, the oil produced by ATAPCO was sold in the field to petroleum refiners or their oil purchasing *139 subsidiaries or to companies engaged in gathering oil and reselling the gathered oil to petroleum refiners or their oil purchasing subsidiaries. At all relevant times, the gas produced by ATAPCO was sold in the field to natural gas companies or operators of plants which extract liquid material from the natural gas. ATAPCO does not refine or otherwise process the oil and gas produced by it. None of the oil and gas produced by ATAPCO was sold to Crown, but small quantities were sold to subsidiaries of Jersey and Indiana. Customarily, only one company buys the oil produced in the field and that company is required to buy oil from all producers without discrimination. In 1965, ATAPCO owned 450 shares of the class A capital stock of Charles Street Development Corp., a Maryland corporation (hereinafter called Charles Street). Charles Street had issued and outstanding 900 shares of class A capital stock and 900 shares of class B capital stock. The other 450 shares of the class A capital stock of Charles Street were owned by Blaustein Industries, Inc., a Maryland corporation, all of the capital stock of which was owned by Jacob Blaustein and his three children with the exception of *140 certain shares of non-voting first preferred stock which were owned by a charitable foundation and grandchildren of Jacob Blaustein. Six children of Matthew M. McCloskey held 855 shares of the class B capital stock of Charles Street and the remaining 45 shares were held by an associate of Mr. McCloskey. Such children and associate did not own any capital stock of ATAPCO and did not have any relationship to ATAPCO otherwise than in connection with Charles Street. The class A capital stock of Charles Street was held by ATAPCO subject to the provisions of Charles Street's charter and bylaws and various agreements, which provided, in substance, that each class of stock would elect one-half the directors, each group of directors would elect certain officers, concurrence by both groups would be required for various actions and for various restrictions on the sale of the stock and interests in the enterprise. During the year 1965, Charles Street owned lands in Baltimore City, Maryland, fronting on Baltimore Street, Charles Street and Fayette Street. The frontage along Charles Street was interrupted by a street known as Wilkes Lane. The frontage along Baltimore Street was not continuous, *141 being interrupted by parcels of land owned by others, some of which was leased by Charles Street. The intersection of Charles and Baltimore Streets is the technical center of Baltimore City, and the lands owned by Charles Street are immediately to the east of an Urban Renewal area known as Charles Center. With the exception of a small part of lands fronting on Baltimore Street, all of the lands had been acquired by Charles Street in 1960 from The May Department Stores Co. for $1,300,000 of which $300,000 was paid in cash and the balance of which was evidenced by a purchase money mortgage in the original amount of $1,000,000. In 1961, Charles Street started the construction of a large office building (the Blaustein Building) on that part of such lands (measuring approximately 112 feet along Charles Street and approximately 140 feet along Fayette Street and Wilkes Lane) which fronted on Charles Street between Wilkes Lane and Fayette Street. This building, which had 25 office floors, a lobby floor with commercial tenants, a mezzanine floor occupied by the trust department and a branch banking office of Union Trust and a small garage for tenant parking, was completed in 1963 (except *142 for tenant improvements in unrented space) at a total cost, exclusive of land, of approximately $8,746,000. The cost of constructing this office building was covered in part by $8,100,000 borrowed from the Prudential Insurance Co. of America, which was secured by a first mortgage on the land and building. In connection with the construction of the Blaustein Building, the original purchase money mortgage was divided into two parts, with two-thirds being allocated to a mortgage on the land under the Blaustein Building. In connection with the construction of the Blaustein Building , a part of the existing improvements fronting on Charles Street between Wilkes Lane and Baltimore Street were demolished and the land was paved and used as a parking lot. The balance of the lands between Wilkes Lane and Baltimore Street which were owned or leased by Charles Street were improved by old retail stores, some of which were vacant. These lands were subject to the unpaid balance of the remaining one-third of the purchase money mortgage and two purchase money mortgages which had been incurred in connection with the acquisition of properties fronting on Baltimore Street in addition to the properties *143 acquired in 1960. The fair market value of Charles Street's equity in the Blaustein Building and land in 1965 was $1,700,000. The fair market value of Charles Street's equity in other lands and improvements owned by it in 1965 was $100,000. In 1965, Charles Street's only other assets consisted of furniture and equipment, operating supplies, accounts receivable, prepaid expenses and like assets which did not have a value in excess of its liabilities exclusive of unpaid principal owing on mortgage indebtedness and amounts owing to its stockholders. ATAPCO's basis for determining gain or loss on a sale of the 450 shares of class A capital stock of Charles Street owned by it in 1965 was $90,000 and such stock was carried as an asset on the balance sheet of ATAPCO in the amount of $90,000. At the beginning of 1965, Charles Street owed its stockholders $2,817,600 for advances received from time to time in connection with the construction of the Blaustein Building and for other purposes. Such funds had been advanced by the stockholders in proportion to their respective stock ownership and $704,400 of such amount was owed to ATAPCO. On March 31, 1965, Charles Street repaid $500,000 *144 from the proceeds of the final advance against the mortgage on the Blaustein Building, of which $125,000 was paid to ATAPCO, reducing the amount owed to it to $579,400. Thereafter, on April 30, 1965, October 31, 1965, and December 31, 1965, further payments on this indebtedness were made by Charles Street to ATAPCO and the other stockholders in the respective amounts of $80,000, $20,000 and $20,000, of which $20,000, $5,000 and $5,000 were paid to ATAPCO. On December 31, 1965, Charles Street owed its stockholders $2,197,600 of which $549,400 was owed to ATAPCO. The amounts owed by Charles Street to ATAPCO during 1965 were carried as assets in such amounts on the balance sheet of ATAPCO. In February 1965, ATAPCO purchased the Dinkler Motor Hotel in Atlanta, Georgia, for $400,000 (plus adjustments at closing) subject to mortgages aggregating $1,200,000. In April 1965, ATAPCO purchased the Americana Apartments in Dallas, Texas, for $340,000 (minus closing adjustments) subject to mortgages aggregating $2,220,000. Each such purchase included land, improvements, furniture and equipment. At all times during 1965, the fair market values of these properties were their costs less depreciation *145 and the fair market values of ATAPCO's equity was such cost less depreciation and less the unpaid principal balance of the mortgage debts. On December 31, 1965, the depreciated cost of these properties was $4,095,933.34 and the unpaid principal balances of the mortgage debts aggregated $3,367,640.36. In May 1964, ATAPCO acquired all of the capital stock of Wilshire Properties, Inc., a Maryland corporation, for $225,000. The funds so received by Wilshire Properties, Inc., were used by the latter to acquire from Prudential Insurance Co. of America a lease on a tract of land on Wilshire Boulevard, Los Angeles, California. The tract of land was partially improved with old buildings and it was ATAPCO's intention to demolish such buildings and construct new buildings. During 1964 and 1965, ATAPCO advanced Wilshire Properties, Inc., such funds as were necessary to enable the latter to pay the rent, property taxes and other expenses incurred by it. The excess of such rent, property taxes and other expenses incurred by Wilshire Properties, Inc., over the revenues received by it were capitalized. All amounts so advanced by ATAPCO to Wilshire Properties, Inc., were carried as an asset *146 on the balance sheet of ATAPCO at a value equal to the total thereof. In 1965, the fair market value of the capital stock of Wilshire Properties, Inc., was $225,000 and the fair market value of the advances was equal to the advances. On October 31, 1961, ATAPCO purchased all of the assets of Atlas Sound Corp. for $959,481 payable in cash, $600,000 payable in notes over 5 years from 1962 to 1966 and an assumption of all liabilities with the exception of certain income tax liabilities and liabilities related to the transaction. The excess of the purchase price so paid over the tangible assets acquired was $688,259.09, and such amount was included as an asset on the balance sheet of ATAPCO under the caption "Purchase Price of Atlas Sound * * * Divisions in excess of net tangible assets." Atlas Sound Corp. was engaged in the business of manufacturing horn-type loudspeakers, microphone stands and accessories and related products. During 1965, and prior thereto, the business of Atlas Sound was conducted from a lease multistory loft building in Brooklyn, New York. In 1965, ATAPCO was planning to move these operations to a building to be built by it in Parsippany, New Jersey, and *147 this move was accomplished in 1966. After acquiring the business of Atlas Sound Corporation, ATAPCO conducted such business as a division and not as a separate entity. While the division operations were largely autonomous and records were maintained and statements prepared as to its operations and its assets and liabilities, such statements did not reflect the results of operations and its assets and liabilities in the same manner as if the Atlas Sound Division were a separate corporate entity. In particular, the statements as to results of operations did not reflect any allowance for income taxes since other deductions of ATAPCO offset the income of this division or any deduction for management, financial, legal and accounting services which were provided by the corporate headquarters of ATAPCO. Similarly, the statements as to assets and liabilities were limited to those assets and liabilities which were specifically allocated to Atlas Sound and did not include liabilities for borrowed funds or cash in ATAPCO's general accounts. In 1965, the value of Atlas Sound was $1,900,000 (inclusive of the $688,259.09 previously recorded as an asset) in addition to the excess of its *148 tangible assets over liabilities, other than the liability to pay the unpaid balance of $120,000 owing on the deferred portion of the purchase price. The value of Atlas Sound on July 8, 1965, after giving effect to such increase in the value over tangible assets, but before reducing such value by the $120,000 owing on the deferred portion of the purchase price, was $2,660,000 and such value was $3,100,000 on December 8, 1965. On September 30, 1964, ATAPCO acquired all of the assets of Kromex Corp., other than cash equal to liabilities which were not assumed by ATAPCO, for $4,150,000 and an assumption of liabilities other than liabilities for certain income tax obligations (including income tax obligations to be incurred in connection with the transaction) and certain liabilities for expenses in connection with the transaction. The excess of the amount so paid over the tangible assets acquired was $897,994.34 and such amount was included as an asset on the balance sheet of ATAPCO under the caption "Purchase price of * * * Kromex (Divisions) in excess of net tangible assets." Kromex Corp. was engaged in the manufacture of aluminum and chrome-plated kitchenwares and aluminum, chrome-plated, *149 wooden and other gift wares. Its factory and offices were located in Cleveland, Ohio. After its acquisition by ATAPCO, the business previously conducted by the Kromex Corp. was conducted as a division of ATAPCO and not as a separate entity. During 1965, the business of ATAPCO's Kromex Division continued to have a value of $897,994.34 in excess of tangible assets and continued to have a value as an entirety of $4,150,000 in excess of liabilities. In December 1964, ATAPCO borrowed $15,000,000 on long-term unsecured notes, repayable in annual installments of $1,000,000 each commencing on December 1, 1970. Of the amount so borrowed, $12,000,000 was applied in repayment of then outstanding unsecured indebtedness of ATAPCO and the balance of $3,000,000 was added to ATAPCO's general funds and was available for future use. Such $3,000,000 was not used in 1965 and continued to be available for future use. During 1965, ATAPCO had a number of inactive subsidiaries. One such subsidiary (Belvedere Petroleum Corp.) had been organized to explore for oil and gas in Canada, but did not start operations until 1966. The other such subsidiaries had been organized for nameholding purposes. *150 None of such subsidiaries had any assets other than cash and capitalized organization expense. All amounts paid by ATAPCO for stock in subsidiaries or as advances to such subsidiaries were included as assets on the balance sheet of ATAPCO at values equal to the amounts so paid or advanced and had fair market values equal thereto. From the time of its incorporation through 1965, shares of capital stock of ATAPCO were never owned by anyone other than Louis Blaustein, his wife, Henrietta G. Blaustein, descendants of Louis Blaustein, spouses of such descendants, the estates of Louis Blaustein, Fanny B. Thalheimer, Alvin Thalheimer and Henrietta G. Blaustein and inter vivos and testamentary trusts for the benefit of such descendants of Louis Blaustein and spouses with the following exceptions: (a) On October 23, 1952, 180,000 shares of class B first preferred stock of ATAPCO were sold by the owners thereof to six institutional purchasers who converted such class B first preferred stock into shares of class A first preferred stock. Such shares of class A first preferred stock were subsequently redeemed with the final redemption occurring on December 30, 1958; (b) From time to time, *151 shares of 6 percent cumulative second preferred stock have been contributed to charitable foundations; (c) Fanny B. Thalheimer, Alvin Thalheimer and Henrietta G. Blaustein each bequeathed shares of class B common stock to charitable foundations. Throughout 1965, ATAPCO had issued and oustanding 4 classes of capital stock consisting of 116,496 shares of 5 percent cumulative class B first preferred stock; 391,092 shares of 6 percent cumulative second preferred stock; 185,310 shares of no-par value class A common stock; and 541,630 shares of no-par value class B common stock. Only the class A common stock held the power to vote. The following tables show the owners of the various classes of capital stock of ATAPCO on December 31, 1965, and the changes which occurred in such holdings during the year 1965: 5% CUMULATIVE CLASS B FIRST PREFERRED STOCK
($10 Par Value)
Beneficial Owners
Shares
Percent of
Total Jacob Blaustein, Trustee
88,000
75.54%
Jacob Blaustein
802
.69
Ruth B. Rosenberg
1,047
.90
Morton K. Blaustein
985
.84
Barbara B. Hirschhorn
1,000
.86
Elizabeth B. Roswell
985
.84
Susan Morton Blaustein
1,000
.86
Jeanne Patz Blaustein
700
.60
Daniel Blaustein Hirschhorn
1,000
.86
Michael Joseph Hirschhorn
1,000
.86
Deborah Sophie Hirschhorn
1,000
.86
Sarah Beth Hirschhorn
400
.34
Robert Alan Roswell
1,000
.86
Marjorie Blaustein Roswell
400
.34
Louis Blaustein Thalheimer
992
.85
Elizabeth Lyon Thalheimer
997
.86
Marjorie Ellen Thalheimer
997
.86
Henry A. Rosenberg, Jr.
997
.86
Ruth R. Davidson
981
.84
Judith R. Hoffberger
997
.86
Henry A. Rosenberg III
1,000
.86
Edward Lee Rosenbergh
1,000
.86
Frank Blaustein Rosenberg
1,000
.86
Lisa Joy Davidson
1,000
.86
Julie Gail Davidson
1,000
.86
Jeffrey Alan Hoffberger
1,000
.86
Russell Jay Hoffberger
100
.08
Estate of Henrietta Blaustein [1]
3,071
2.63
Estate of Alvin Thalheimer [2]
666
.57
Alvin Thalheimer, Herbert Thalheimer, Jacob
381
.33
Blaustein and Ruth B. Rosenberg, Trustees U/W
(Item IX) Fanny B. Thalheimer
Alvin Thalheimer, Jacob Blaustein, Ruth B.
898
.77
Rosenberg, and Union Trust Co. of Maryland,
Trustees, U/A with Herbert Thalheimer dated April
15, 1964
Herbert Thalheimer
100
.08
TOTAL 116,496
100.00%
*152 Changes since 12/31/64: 6% CUMULATIVE SECOND PREFERRED STOCK
($10 Par Value)
Beneficial Owners
Shares
Percent of
Total Jacob Blaustein, Trustee
176,000
45.00%
Morton K. Blaustein
6,145
1.57
Susan Morton Blaustein
6,200
1.59
Jeanne Patz Blaustein
500
.13
Estate of Henrietta Blaustein [1]
1,866
.48
Jacob Blaustein
157
.04
Barbara B. Hirschhorn
6,447
1.65
Daniel Blaustein Hirschhorn
2,600
.66
Michael Joseph Hirschhorn
800
.20
Deborah Sophie Hirschhorn
500
.13
Sarah Beth Hirschhorn
500
.13
Elizabeth B. Roswell
6.310
1.61
Robert Alan Roswell
2,597
.66
Marjorie Blaustein Roswell
500
.13
Ruth R. Davidson [2]
6,313
1.61
Lisa Joy Davidson [2]
4,690
1.20
Julie Gail Davidson [2]
2,300
.59
Henry A. Rosenberg, Jr.
7,457
1.91
Henry A. Rosenberg III
7,100
1.82
Edward Lee Rosenberg [3]
5,297
1.35
Frank Blaustein Rosenberg [2]
3,500
.89
Ruth B. Rosenberg [4]
46,306
11.84
Louis Blaustein Thalheimer
9,283
2.37
Elizabeth Lyon Thalheimer
9,494
2.43
Marjorie Ellen Thalheimer
9,496
2.43
Judith R. Hoffberger [2]
7,355
1.88
Jeffrey Alan Hoffberger [2]
3,500
.89
Russell Jay Hoffberger [2]
1,400
.36
The Louis and Henrietta Blaustein Foundation,
2,600
.67
Inc. [5]
The Henry and Ruth B. Rosenberg Foundation, Inc.
14,500
3.71
[6]
Estate of Alvin Thalheimer [7]
3,779
.97
Alvin Thalheimer, Herbert Thalheimer, Jacob
2,165
.55
Blaustein and Ruth B. Rosenberg, Trustees U/W
(Item IX) Fanny Thalheimer
Alvin Thalheimer, Jacob Blaustein, Ruth B.
33,235
8.50
Rosenberg and Union Trust Co. of Maryland,
Trustees U/A with Herbert Thalheimer dated April
15, 1964
Herbert Thalheimer 200
.05
TOTAL
391.092
100.00%
*153 NO-PAR VALUE CLASS A COMMON STOCK
($5Stated Value)
Beneficial Owners
Shares
Percent of
Total Jacob Blaustein, Trustee
55,000
29.68%
Jacob Blaustein, Alvin Thalheimer and Ruth B.
23,100
12.47
Rosenberg, Trustees
Alvin Thalheimer, Jacob Blaustein and Ruth B.
17,100
9.23
Rosenberg, Trustees
Ruth B. Rosenberg, Alvin Thalheimer and Jacob
17,100
9.23
Blaustein, Trustees
Estate of Henrietta Blaustein [1]
9,700
5.23
Jacob Blaustein
14,970
8.08
Ruth B. Rosenberg
24,170
13.04
Estate of Alvin Thalheimer [2]
15,367
8.29
Alvin Thalheimer, Herbert Thalheimer, Jacob
8,803
4.75
Blaustein and Ruth B. Rosenberg, Trustees U/W
(Item IX) Fanny B. Thalheimer TOTAL
85,310 100.00%
*154 Changes since 12/31/64: NO-PAR VALUE CLASS B COMMON STOCK
($5Stated Value)
Beneficial Owners
Shares
Percent of
Total Jacob Blaustein, Trustee
165,000
30.46%
Jacob Blaustein
44,910
8.29
Ruth B. Rosenberg
72,510
13.39
Estate of Henrietta Blaustein [1]
29,100
5.37
Jacob Blaustein, Alvin Thalheimer and Ruth B.
69,300
12.80
Rosenberg, Trustees
Alvin Thalheimer, Jacob Blaustein and Ruth B.
51,300
9.47
Rosenberg, Trustees
Ruth B. Rosenberg, Alvin Thalheimer and Jacob
51,300
9.47
Blaustein, Trustees
The Alvin and Fanny Blaustein Thalheimer
13,000
2.40
Foundation, Inc.
Estate of Alvin Thalheimer [2]
28,745
5.31
Alvin Thalheimer, Herbert Thalheimer, Jacob
16,465
3.04
Blaustein and Ruth B. Rosenberg, Trustees U/W
(Item IX) Fanny B. Thalheimer TOTAL
541,630
100.00%
*155 Changes since 12/31/64: During the years 1960 to 1965, ATAPCO paid the following dividends on its capital stock: Dividend
Year
Preferred
Common 1960
$292,903.20
$ 74,124.00
1961
292,903.20
74,124.00
1962
292.903.20
74,124.00
1963
292,903.20
109,041.00
1964
292,903.20
181,735.00
1965
292,903.20
363,470.00
For the years 1961 through the including 1965, ATAPCO reported no taxable income on its corporate Federal income tax returns filed with the Internal Revenue Service and, therefore, paid no tax with the filing of its returns. The comparative balance sheet of ATAPCO as of December 31, 1965, and December 31, 1964, is as follows: AMERICAN TRADING AND PRODUCTION CORPORATION
CORPORATION BALANCE SHEET
ASSETS
December 31
CURRENT ASSETS
1965
1964 Cash
$ 6,687,090.82
$ 6,318,133.08
Accounts receivable - trade
1,932,490.08
1,754,345.13
Inventory - at lower of cost or market:
1,514,858.60
1,294,338.20
Merchandise, materials and supplies
Prepaid expenses 307,624.57
302,271.68
TOTAL CURRENT ASSETS
10,442,064.07
9.669,088.09
INVESTMENTS AND OTHER ASSETS
Capital stock of other companies - at cost
14,881,397.77
14,811.883.61
(except as stated in Note A) which is
substantially less than quoted market
Purchase price of Atlas Sound and Kromex
1,586,253.43
1,591,945.25
Divisions in excess of net tangible assets
Advances, insurance claims and sundry
1,168,609.35
882.967.64
TOTAL INVESTMENT AND OTHER ASSETS
17,636,260.55
17,286,796.50
PROPERTY, PLANT AND EQUIPMENT - on the basis
of cost
Oil and gas properties, less allowance for
7,762,205.11
7,809,515.87
depreciation, depletion and amortization
1965, $4,646,987.23; 1964, $5,253,744.55
Vessels, less allowance for depreciation
4,217,132.77
3,701,653.53
1965, $7,950,271.52; 1964, $7,685,915.68 -
Note B
Manufacturing Divisions:
Land
107,072.36
90,272.36
Buildings, less allowance for depreciation
517,290.24
554,672.94
1965, $35,105.90; 1964, $7,021.20
Equipment, less allowance for depreciation
1,238,954.26
1,405,068.97
1965, $299,459.76; 1964, $86,066.04
1,863,316.86
2,050,014.27
Real Estate Division - Note B:
Land
821,001.07
-0-
Buildings, less allowances for depreciation
2,918,432.65
-0-
of $58,264.12
Equipment less allowance for depreciation of
356,499.62
-0-
$28,614.16
4,095,933.34
-0-
Other equipment and leasehold improvements,
275,384.12
277,804.58
less allowance for depreciation and
amortization 1965, $287,548.37; 1964,
$255,723.80
TOTAL PROPERTY, PLANT AND EQUIPMENT
18,213,922.21
13,838,988.25
TOTAL ASSETS
$46,292,246.83
$40,794,872.84
*156 LIABILITIES AND STOCKHOLDERS' EQUITY
December 31
1965
1964 CURRENT LIABILITIES
aCCOUNTS payable and accrued expenses
$1,905,861.26
$ 1,652,935.41
Federal income taxes-Note C
650,000.00
-0-
ies on long-term debt
387,457.57
294,151.00
TOTAL CURRENT LIABILITIES
2,943,318.83
1,947,086.41
LONG-TERM DEBT,less current maturities-Note
15,000,000.00
15,000,000.00
B5-1/4% Notes-unsecured
Notes payable to stockholders, due
285,175.00
285,175.00
1967-unsecured
Preferred Purchase Money Mortgage-payable on
1,185,468.73
1,359,619.73
a vessel
Purchase Money Mortgage Notes
3,274,033.79
-0-
5% Purchase Money Note
-0-
120,000.00
TOTAL LONG-TERM DEBT
19,744,677.52
16,768,794.73
DEFERRED INCOME
Credits applicable to unterminated
470,984.46
694,471.82
voyages-net
TOTAL LIABILITIES
23,158,980.81
19,110,352.96
STOCKHOLDERS' EQUITY:
CAPITAL STOCK (as of December 31)
Class A First Preferred Stock, 5% cumulative,
par value $10.00 per share:
authorized and unissued 120,000 shares
-0-
-0-
Class B First Preferred Stock, 5% cumulative,
par value $10.00 per share:
authorized 120,000 shares: outstanding
1,164,960.00
1,164,960.00
116,496
Second Preferred Stock, 6% cumulative, par
value $10.00 per share:
authorized 1,000,000 shares; outstanding
3,910,920.00
3,910,920.00
391,092 shares
Class A Common Stock,no par value:
Authorized 200,000 shares; outstanding
926,550.00
926,550.00
185,310 shares
Class B Common Stock, no par value:
authorized 2,000,000 shares: outstanding
2,708,150.00
2,708,150.00
541,630 shares
Capital stock at end of year h8,710,580.00
8,710,580.00
EARNEDSURPLUS
balance at beginning of year
12,673,939.88
10,487,661.23
Additions:
Net earnings for the year
3,353, 65.12
2,660,916.85
16,027,305.00
13,148,578.08
Deductions:
Cash dividends declared and paid:
On 5% Class B First Preferred Stock
58,248.00
58,248.00
On 6% Second Preferred stock
234,655.20
234,655.20
On Common Stock
363,470.00
181,735.00
656,373.20
474,638.20
Adjustment resulting from settlement of prior
948,245.78
-0-
years' federal income tax claims, including
interest
1,604,618.98
474,638.20
earned surplus at end of year
14,422,686.02
12,673,939.88
TOTAL STOCKHOLDERS' EQUITY AT END OF YEAR
23,133,266.02
21,384,519.88
TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY
$46,292,246.83
$40,794,872.84
*157 NOTES TO THE BALANCE SHEET
Notes: A. S ecurities owned recorded at cost excepting Std. Oil Co. (N.J.) which was recd. as dividends and recorded at fair market values (sales and repurchases in 1964 and 1965 recorded at cost). B. 5-1/4% Notes to be repaid $1,000,000 annually commencing December 1, 1970. One of co. tankers with $2,726,828 depreciated cost covered by purchase money mortgage of $1,359,620 payable $174,151, balance September 10, 1973. Real Estate Div. assets subject to $3,367,340 in purchase money mortgages. C. IRS tax deficiency yrs. 1955 - 1959 settled for $650,000 plus interest. The total book value of ATAPCO's assets rose from $32,470,798.75 as of December 31, 1959, to $50,810,313 as of December 31, 1966. The total stockholders' equity as reflected on ATAPCO's books rose from $18,312,783.90 as of December 31, 1959, to $27,658,130 as of December 31, 1966. The fair market value of ATAPCO's 25 percent interest in Charles Street Development Corp. as of July 8, 1965, and December 8, 1965, was $450,000. The fair market value of ATAPCO's holdings in Union Trust Co. of Maryland as of July 8, 1965, and December 8, 1965, was $1,815,907 and $1,923,570, respectively. *158 The fair market value of ATAPCO's holdings in United States Fidelity and Guaranty Co. as of July 8, 1965, and December 8, 1965, was $262,797 and $299,054, respectively. The balance sheets of Crown as of December 31, 1961, and December 31, 1965, were as follows: CROWN CENTRAL PETROLEUM COMPANY AND
SUBSIDIARIES
Consolidated Balance Sheet December
31, 1961
ASSETS
CURRENT ASSETS
Cash
$ 2,678,885
Trade accounts receivable, net of
8,064,615
allowance for doubtful accounts
Refundable Federal taxes on income
63,434
- estimated
Inventories:
Crude oil and refined products - at
$ 9,237,311
cost not in excess of market
Material and supplies - at cost 512,765
9,750,076
TOTAL CURRENT ASSETS
$20,557,010
OTHER ASSETS
Investments, sundry accounts
116,978
receivable, etc. (Note A)
PROPERTY, PLANT AND EQUIPMENT -
2,642,374
substantially at cost Land
Oil and gas properties
6,767,837
Less allowance for depletion and
3,994,396
2,773,441
depreciation
Refinery, pipe lines and other
26,684,673
equipment
Less allowance for depreciation
15,312,877
11,371,796
16,787,611
DEFERRED CHARGES
Prepaid expenses, etc.
217,246
$37,678,845
LIABILITIES
CURRENT LIABILITIES
Long-term debt - due within one
$ 1,400,000
year (Note B)
Accounts payable and accruals
8,224,030
TOTAL CURRENT LIABILITIES
$ 9,624,030
LONG-TERM DEBT (Note B)
7,100,000
CAPITAL STOCK AND SURPLUS
Capital stock:
Preferred stock - 5%
non-cumulative, voting, par value
$100 per share: Authorized 761
shares, none outstanding
Common stock - par value $5per
share:
Authorized 2,500,000 shares issued
$ 4,128,600
and issuable 825,720 shares
Less in treasury 735-63/75 shares
3,679
4,124,921
Surplus:
Capital surplus
2,539,655
Earned surplus
14,290,239
20,954,815
$37,678,845
*159 NOTES TO FINANCIAL STATEMENTS NOTE A - The accounts NOTES TO FINANCIAL STATEMENTS NOTE A - The accounts of four wholly-owned subsidiaries, which have been excluded from consolidation, are not material. The accounts of all other wholly-owned subsidiaries have been consolidated. NOTE B - Long-term debt at December 31, 1961, consists of the following: PAYABLE
WITHIN
AFTER
ONE
ONE
YEAR
YEAR 4.7% notes secured by deeds of trust dated
$600,000
$3,900,000
November 30, 1954, as supplemented and amended by
supplemental deeds of trust dated July 1, 1957,
April 1, 1958, and January 1, 1961, due in
quarter-annual installments of $150,000
5-1/4% notes under credit agreement dated January
800,000
3,200,000
1, 1961, due in quarter-annual installments of
$200,000 beginning March 31, 1962
$1,400,000
$7,100,000
The deeds of trust securing the 4.7% notes cover specific oil and gas properties in Louisiana and Texas and 3,000 shares of Crown-Rancho Pipe Line Corporation capital stock (a wholly-owned subsidiary). The deeds of trust and credit agreement contain certain restrictions and stipulations on the declaration of dividends, retirement *160 of stock, capital expenditures and the consolidated net working capital of the Company and its subsidiaries. CROWN CENTRAL PETROLEUM COMPANY AND
SUBSIDIARIES
Consolidated Balance Sheet…Dec
Balance Sheet December 31, 1965
ASSETS
CURRENT ASSETS
Cash
$ 5,277,274
Trade accounts receivable, net of
6,403,337
allowance for doubtful accounts
Inventories:
Crude oil and refined products - at
$ 9,094,137
cost not in excess of market
Materials and supplies - at cost
483,266
9,577,403
TOTAL CURRENT ASSETS
$21,258,014
OTHER ASSETS
48,048
PROPERTY, PLANT AND EQUIPMENT -
substantially at cost (Note A)
Land
4,811,974
Oil and gas properties
7,552,864
Refinery, pipe lines and other
35,451,135
equipment
43,003,999
Less allowances for depreciation
25,009,497
17,994,502
22,806,476
and depletion
DEFERRED CHARGES
Prepaid expenses, etc.
154,760
$44,267,298
LIABILITIES
CURRENT ar (Note A)
$ 1,957,298
Accounts payable and accruals
9,417,933
Federal LIABILITIES
$11,789,458
LONG-TERM DEBT (Note A)
8,902,614
CAPITAL STOCK AND SURPLUS
Common Stock - par value $5per
share:
Authorized 2,500,000 shares issued
$ 4,128,600
and issuable 825,720 shares
Less in treasury 742-35/75shares.
3;712
4,124,888
Surplus:
Capital ,539,655
Earned surplus
16,910,683
23,575,226
$44,267,298
*161 NOTE TO FINANCIAL STATEMENTS NOTE A - Long-term debt at December 31, 1965, consists of the following: PAYABLE
WITHIN
AFTER
ONE
ONE
YEAR
YEAR 4.7% notes secured by deeds of trust dated
$ 600,000
$1,500,000
November 30, 1954 as supplemented and amended,
due in quarter-annual installments of $150,000.
Specific oil and gas properties in Louisiana and
Texas and 3,000 shares of capital stock of
Crown-Rancho Pipe Line Corporation (a
wholly-owned subsidiary) have been pledged as
collateral on the deeds of trust
Notes under credit agreement dated January 1,
1961, as supplemented and amended:
5-1/4% notes due in quarter-annual installments
200,000
750,000
of $50,000.
5% notes due in quarter-annual installments of
600,000
2,250,000
$150,000.
Notes on which specific service station
properties or leaseholds have been pledged as
collateral:
Non-interest bearing notes issued March 15, 1963,
81,179
500,601
due in monthly installments of $6,765
4-1/2% to 6% notes issued at various dates due in
416,119
3,482,013
monthly installments covering principal and
interest with final payments due at various dates
between 1966 and 1980.
Non-interest bearing notes dated December 31,
60,000
420,000
1963, due in quarter-annual installments of
$15,000 $1,957,298
$8,902,614
*162 The deeds of trust and credit agreement contain certain r The deeds of trust and credit agreement contain certain restrictions and stipulations on the declaration of dividends, retirement of stock, capital expenditures and the consolidated net working capital of the Company and its subsidiaries. The statement of Crown's consolidated income for the year ending December 31, 1961, was as follows: CROWN CENTRAL PETROLEUM CORPORATION AND
SUBSIDIARIES
Year Ended December 31, 1961
STATEMENT OF CONSOLIDATED INCOME
Gross operating income
$66,410,463
Cost of sales and operating expenses (exclusive
of depreciation, depletion, etc.):
Cost of sales
$57,290,501
Selling and administrative expense
5,460,692
62,751,193
OPERATING PROFIT BEFORE DEPRECIATION, DEPLETION,
3,659,270
ETC.
OTHER INCOME
Discounts, rentals, etc.
66,161
3,725,431
OTHER DEDUCTIONS
Employees' Pension Trust
192,500
Employees' Savings Plan
118,388
Employees' Security Expense
145,570
Interest, discounts, exchange, etc.
614,462
Bad debts
56,265
1,127,185
PROFIT BEFORE DEPRECIATION, DEPLETION, ETC.
2,598,246
DEDUCT
Depreciation of plant and equipment
1,493,356
Depletion
262,295
Abandonments and sales of property, plant and
278,080
2,033,731
equipment - net
INCOME BEFORE TAXES
564,515
TAXES ON INCOME - estimated:
Refundable Federal income taxes
71,473
NET INCOME
$635,988
*163 The statement of Crown's consolidated income for the year ended December 31, 1965, was as follows: CROWN CENTRAL PETROLEUM CORPORATION AND
SUBSIDIARIES
Year Ended December 31, 1965
STATEMENT OF CONSOLIDATED INCOME
Gross operating income
$70,694,840
Cost of Sales and Operating Expenses (exclusive
of depreciation, depletion, etc.):
Cost of sales
$58,464,739
Selling and Administrative expense
6,970,908
65,435,647
OPERATING PROFIT BEFORE DEPRECIATION, DEPLETION,
5,259,193
ETC.
OTHER INCOME
Discounts, rentals, etc.
95,747
5,354,940
OTHER DEDUCTIONS
Employees' Pension Trust
350,000
Employees' Savings Plan
124,636
Employees' Security Expense
108,809
Interest, discounts, exchange, etc.
790,890
Bad debts
96,651
1,470,986
PROFIT BEFORE DEPRECIATION, DEPLETION, ETC.
3,883,954
DEDUCT
Depreciation
1,843,690
Depletion
311,516
Abandonments and sales of property, plant and
( 200,075)
1,955,131
equipment - net
INCOME BEFORE TAXES
1,928,823
FEDERAL INCOME TAXES
419,161
NET INCOME
$1,509,662
The following schedule represents for each month during the years 1964, 1965 and 1966 the number of shares of Crown common *164 stock traded on the American Stock Exchange and the high, low and closing price per share during such month: CROWN CENTRAL PETROLEUM
High
Low
Close
Volume
1964
Jan.
14 6/8
13 7/8
13 7/8
7,300
Feb.
13 6/8
12 5/8
12 5/8
6,000
Mar.
132/8
12 2/8
12/58
6,400
Apr.
13 7/8
12 4/8
13 1/8
11,200
May
17 7/8
13 1/8
15 4/8
18,600
June
15 3/8
14
14 3/8B.
4,800
July
15 2/8
14 2/8
14 6/8
3,100
Aug.
17 5/8
13 3/8
15 7/8
24,200
Sept.
16 6/8
14
14 4/8B.
72,000
Oct.
15 2/8
14
14 4/8
2,700
Nov.
15
14 1/8
14B.
2,200
Dec.
14 6/8
13 7/8
13 7/8
4,100
Total
97,800
1965
Jan.
14 3/8
13 5/8
13 4/8B.
2,600
Feb.
14 3/8
13 3/8
13 4/8B.
4,100
Mar.
15 1/8
13 4/8
14 4/8
7,000
Apr.
15 2/8
14
14 6/8
7,000
May
14 6/8
14
14B.
6,400
June
14
12
12 2/8
4,600
July
13
12 1/8
12 6/8B.
4,200
Aug.
13 3/8
12 5/8
13 1/8
2,100
Sept.
14 4/8
13 1/8
13 5/8B.
4,400
Oct.
14 2/8
13 3/8
14 2/8
3,100
Nov.
14 2/8
13 5/8
13 6/8B.
2,100
Dec.
17
13
15 2/8
12,300
Total
59,900
1966
Jan.
26
15 4/8
26
107,400
Feb.
28 4/8
22 4/8
26
62,600
Mar.
26 6/8
24
24 6/8
25,700
Apr.
32 5/8
25
29
59,900
May
32 6/8
23 7/8
30
27,200
June
31 2/8
27 2/8
27 3/8
10,300
July
29 6/8
26 2/8
27 1/8
9,800
Aug.
28
20 5/8
20 6/8
16,100
Sept.
23
20
21 3/8
9,900
Oct.
23 5/8
20
23 4/8
8,400
Nov.
30
23 4/8
27 6/8
16,200
Dec.
33 3/8
26 3/8
29 6/8
33,800
Total
387,300
*165 A study of Crown as an oil and gas industry company in relation to other companies in the same industry shows that as of the valuation dates, July 8, 1965 and December 8, 1965, Crown common was substantially underpriced in public trading. The fact is illustrated by the following tabulation in which stock prices of Crown common and eight other oil companies were related to earnings, cash flow and book values: crown CENTRAL PETROLEUM CORP. RATIOS OF STOCK PRICE TO EARNINGS, CASH FLOW
AND BOOK VALUE COMPARED TO SIMILAR RATIOS FOR EIGHT SMALL TO MEDIUM SIZE OIL
COMPANIES
For 7/8/65
Value
Analysis
Company
Earned 1964
Cash Flow
Book Value
Stock Price
Ratio Value
1964
12/31/64
7/8/65
Ashland Oil &
$ 3.06
$ 6.45
$ 20.99
42
a 13.8
Refining Co.
a=Price
to
Earnings
b 6.5
b = Price
to
Cash Flow
c = Price
to
Book Value
Continental
4.44
10.26
35.83
72 1/2
a 16.4
Oil co.
b 7.1
c 2.0
yr. ended
a-b-c
5/31
Frontier
0.28
1.51
6.59
7 5/8
Refining Co.
Hess Oil &
1.27
2.55
10.24
11
Chemical
Corp.
Kerr-mcGee
3.60
6.60
24.69
52 3/4
Corp. yr.
ended 6/30/64
& 12/31/65
Marathon Oil
4.05
7.09
34.44
56 3/4
Co.
Signal Oil &
2.32
4.44
21.07
26
Gas Co.
Skelly Oil
5.22
13.76
73.65
84 7/8
Co.
Simple
average
of
ratios
a 15.3
b 6.3
c 1.6
Crown Central
0.56
2.96
27.10
12 5/8
22.6
Petroleum
Corp.
Dow-Jones
industrial
index:
7/8/65 877.85
up7.8%
12/8/65
946.60 up
7.8%
*166 For 12/8/65
value
analysis
Company
Earned 1965
Cash Flow
Book Value
Stock Price
ratio Stock
1965
12/31/65
12/8/65
Price
b. 7.8
c 2.4
Continental
$ 3.93
$ 7.20
$23.35
56 1/4
a 14.3
Oiining Co.
c 1.6
c 1.6
Signal Oil &
2.32
4.44
Gas Co.
Co.
4.25
9.47
37.70
71 1/2
a 16.9
b7.5
c 1.9
Frontier
0.37
1.65
6.36
8 1/4
a 22.3
Refining Co.
yr.ended 5/31
b 5.0
c 1.3
Hess Oil &
1.40
2.83
11.33
16 1/2
a 11.8
Chemical
Corp.
b 5.8
c 1.5
Kerr-McGee
3.76
6.94
26.05
70 1/4
a 18.7
Corp yr.
ended 6/30/64
& 12/31/65
b 10.1
c 2.7
Marathon Oil
4.08
6.95
36.02
56
a 13.7
Co.
b 8.1
c 1.6
Signal Oil &
2.40
4.47
23.31
28 7/8
a 12.0
Gas Co.
b 6.4
c 1.2
Skelly Oil
6.97
14.90
78.78
107 1/2
a 15.4
Co.
b 7.2
c 1.4
price
to
earnings
a 15.6
price
tocash
flow
b 7.2
price
to book
value
c 1.7
crown central
1.83
4.44
28.58
13 7/8
7.6
petroleum
corp.
3.1
3.1
0.5
Crown *167 had unusually low earnings in 1964 (as shown by the record of $0.98 per share in 1960; $0.77 in 1961; $1 in 1962; $0.96 in 1963; $0.56 in 1964 (later restated as $0.42); and $1.83 in 1965) and allowing for that anomaly Crown was priced at much lower earnings, cash flow, and book value multipliers than was general in the industry. In the pricing of the 402,851 shares of Crown common, representing 48.8 percent of outstanding shares, it is common practice to pay a premium price for a large block of common stock even when control is not an inherent value factor. However, Crown common was priced in the market at only 50 percent of book value. This was due to the light trading of Crown Central stock. Only 2,100 shares of its common were sold on the American Stock Exchange in the month of November 1965, which is a very low trading volume. Trading was sporadic. Sales of the stock were reported on only two days in the last half of November, and no sales at all were recorded from November 19 to 30, inclusive. ATAPCO's holding of Crown common had a fair market value at least equal to its book value on July 8, 1965 and December 8, 1965. The book value of ATAPCO's holdings in Crown as of *168 July 8, 1965, was $10,917,262. Therefore, the fair market value of ATAPCO's holdings in Crown as of July 8, 1965, was $10,917,262. The book value of ATAPCO's holdings in Crown as of December 8, 1965, was $11,513,482.Therefore, the fair market value of ATAPCO's holdings in Crown as of December 8, 1965, was $11,513,482. The fair market values of ATAPCO's holdings in Indiana as of July 8, 1965, and December 8, 1965, were $97,397,641 and $98,048,695, respectively. The fair market values of ATAPCO's holdings in Jersey as of July 8, 1965, and December 8, 1965, were $11,667,521 and $11,343,423, respectively. ATAPCO was a combination operating and investment company. The public looking at ATAPCO's financial position would see small amounts of earnings and small amounts of dividends. Earnings statements for the five years 1961 to 1965 show that, excluding dividends received, the company had a net operating deficit for each of the years. However, because of large charges for depreciation on tanker vessels and on assets in the oil and gas division, and amortizations of well drilling costs in the latter, the company had substantial deductions that involved no cash outlay. Utilizing *169 dividends received and noncash part of expenses deducted, ATAPCO, in the period examined, had maintained a long-term practice of increasing investments in assets not part of its primary operating activity, the tanker transportation service. Some of the main investments made in the 1961 to 1965 period were: $ 7,027,000
in Oil and Gas Division properties
4,150,00
for acquisition of Kromex Corp.
(September 30, 1964)
1,600,000
for acquisition of Atlas Sound Corp.
(October 31, 1961)
404,395
for equity in Inntown Motor Hotel, Atlanta
(February 28, 1965)
339,295
for equity in Americana Apartments, Dallas (April
30, 1965)
$13,520,690
Total for the five items
ATAPCO made considerable business use of borrowed funds and in the five-year period, December 31, 1960 to December 31, 1965, long-term debt went from $10,270,009 to $19,744,678, an increase of $9,474,669. Working capital in the same period went from a minus $310,119 to $7,498,745, an increase of $7,808,864, which absorbed all but $1,665,805 of the large addition to long-term debt. The policy of the company was to deemphasize earnings, deemphasize dividends actually paid and enhance the assets *170 of ATAPCO. Because of this policy, a determination of the net book value of ATAPCO provides the most accurate measure of the value of class A and class B common stock. The underlying net asset value per share of class A and class B common stock of ATAPCO as of July 8, 1965, was as follows: As Reported
Market Price or
Correction to
In Balance
Value 7/8/65
Reported Net
Sheet
Asset Value
Adjustments To Securities
Owned:
Standard Oil Co. (Indiana)
common Stock
2,083,372 shares at 47 1/16
$ 5,834,530
$ 98,048,695
$+92,214,165
on 7/8/65
Standard Oil Co. (New Jersey)
Common stock
148,159 Shares at 76 9/16 on
7,304,633
11,343,423
+4,038,790
7/8/65
Union Trust Co.
Common Stoek
28,710 Shares at 63 1/4 on
673,405
1,815,907
+1,142,502
7/8/65
U.S. Fidelity & Guaranty Co.
Common stock
4 ,641 Shares at 56 5/8 on
53,331
262,797
+ 209,466
7/8/65
Crown Central Petroleum Corp.
Common stock
402,851 Shares (48.8% of
624,579
10,917,262
+10,292,683
outstanding) at 27.10 Book
value 12/31/64
Charles Street Development
Corp.
450 Shares Common out of
1,800
Shares Outstanding (or 25%)
Agreed Equity Value of
90,000
450,000
+ 360,000
$1,800,000 for year 1965
Oil & Gas Properties
7,809,516
4,000,000
- 3,809,516
Tanker Vessels
3,701,654
4,299,899
+ 598,245
Atlas Sound Division
1,463,302
2,660,000
+ 1,196,698
Kromex Division
3,745,190
4,150,000
+ 404,810
Net Adjustment to Net Asset
+106,647,843
Value
Net Asset Value on Books
21,384,520
Adjusted Net Asset Value:
+128,032,363
Total
Less: 116,496 outstanding
- 5,075,880
shares of 5% Cumulative Class
B First Preferred and 391,092
outstanding shares of 6%
Cumulative Second Preferred
at $10 per share Redemption
Value
Underlying Net Asset Value
122,956,483
Underlying Net Asset Value
169
Per Share of Class A and
Class B Common
*171 The underlying net asset value per share of class A and class B common stock of ATAPCO as of December 8, 1965, was as follows: As Reported
Market Price Or
Correction To
In Balance
Value 12/8/65
Reported Net
Sheet
Asset Value
Adjustments to Securities
Owned:
Standard Oil Co. (Indiana)
Common Stock 2,083,372 Shares
$ 5,834,530
$ 97,397,641
$+91,563,111
at 46 3/4 on 12/8/65:
Standard Oil Co. (New Jersey)
OMMON Stock
148,159 Shares at 78 3/4 on
7,374,147
11,667,521
+ 4,293,374
12/8/65:
Union Trust Co.
Common Stock
28,710 Shares at 67 on 12/8/65:
673,405
1,923,570
+ 1,250,165
U.S. Fidelity & Guaranty Co.
Common Stock
4,641 Shares at 64 7/16 on
53,331
299,054
+ 245,723
12/8/65:
Crown Central Petroleum Corp.
Common Stock
402,851 Shares (48.8%
outstanding)
at $28.58 book value 12/31/65
624,579
11,513,482
+ 10,888,903
Charles Street Development
Corp.
450 Shares Common out of 1,800
90,000
450,000
+ 360,000
Shares Outstanding (or 25%)
Agreed Equity Value of
$1,800,000 for year 1965
Oil & Gas Properties
7,762,205
4,000,000
- 3,762,205
Tanker Vessels
4,217,133
4,309,302
+ 92,169
Atlas Sound Division
1,881,629
3,100,000
+ 1,218,371
Kromex Division
3,697,783
4,150,000
+ 452,217
Net Adjustment to Net Asset
+106,601,828
Value
Net Asset Value on Books
23,133,266
Adjusted Net Asset Value: Total
129,735,094
Less: 116,496 Outstanding
- 5,075,880
Shares of 5% Cumulative Class B
First Preferred and 391,092
Outstanding Shares of 6%
Cumulative Second Preferred at
$10 Per Share Redemption Value
Underlying Net Asset Value
124,659,214
Underlying ass A and Class B
171
Common
*172 The value at the date of death of Dr. Thalheimer of the taxable portion of the death benefit paid by Union Trust Co. of Maryland, trustee under American Trading and Production Corporation Pension Trust Agreement dated December 31, 1948, to Herbert R. Thalheimer, beneficiary, by reason of the death of Dr. Thalheimer was $12,225.77. On the date of his death, Dr. Thalheimer owed Brandeis University the sum of $400, which debt was paid on May 5, 1967.Such debt was in addition to indebtedness aggregating $46,917.03 which were deducted on Schedule K to the Federal estate tax return, and the total indebtedness owing by Dr. Thalheimer on the date of his death and subsequently paid was $47,317.03 Through September 20, 1972, the amounts paid on account of executors' commissions and other expenses incurred in the administration of Dr. Thalheimer's estate aggregated $54,436.64. On December 30, 1963, and December 28, 1964, Mrs. Blaustein made gifts in contemplation of death having an aggregate value of $150,000 ($75,000 for each year). There were no other transfers in contemplation of death by Mrs. Blaustein. Through September 20, 1972, the amounts paid on account of executors' commissions *173 and other expenses incurred in the administration of Mrs. Balustein's estate aggregated $39,302.83. ULTIMATE FINDINGS OF FACT 1. The fair market value of Dr. Thalheimer's 15,367 shares of class A common stock of ATAPCO as of July 8, 1965, was $112 per share with a total fair market value of $1,721,104. 2. The fair market value of Dr. Thalheimer's 28,745 shares of class B common stock of ATAPCO as of July 8, 1965, was $106 per share with a total fair market value of $3,046,970. 3. The fair market value of Mrs. Blaustein's 9,700 shares of class A common stock of ATAPCO as of December 8, 1965, was $113 per share with a total fair market value of $1,096,100. 4. The fair market value of Mrs. Blaustein's 29,100 shares of class B common stock of ATAPCO as of December 8, 1965, was $107 per share with a total fair market value of $3,113,700. OPINION Doctor Alvin Thalheimer died on July 8, 1965, at which time he owned 15,367 shares of Class A common stock and 28,745 shares of class B common stock of American Trading and Production Corp. (ATAPCO). Such holdings represented approximately 8.3 percent and 5.3 percent, respectively, of the total shares of each such class then *174 outstanding. Mrs. Henrietta Blaustein died on December 8, 1965, at which time she owned 9,700 shares of class A ATAPCO common stock and 29,100 shares of class B ATAPCO common stock equal to 5.2 percent and 5.4 percent, respectively, of the shares of each class then outstanding. Class A common stock had exclusive voting privileges and the class B common stock had no voting rights. In all other respects, the class A and class B ATAPCO common stock had identical rights. These blocks represented minority holdings in a privately held corporation in which all other shares were owned or controlled by members of the Blaustein family. In his statutory notice of deficiency, the Commissioner determined that the fair market value of the class A and class B ATAPCO common stock owned by Dr. Thalheimer at death was $167 per share rather than $60 per share as reported on the estate tax return. Similarly, the Commissioner determined in his statutory notice of deficiency that the fair market value of the class A and class B ATAPCO common stock owned by Mrs. Blaustein at death was $168 per share rather than $60 per share as reported on the estate tax return. The only issue remaining in these cases *175 concerns the fair market value of the decedents' shares of class A and class B ATAPCO common stock on the dates of their deaths - July 8, and December 8, 1965. At the dates of death of Dr. Thalheimer and Mrs. Blaustein, ATAPCO was a diversified corporation whose operations included: 1) a Marine Division owning U.S. flag tanker vessels engaged in coastal and worldwide transportation of petroleum, petroleum products, other liquid materials and grain; 2) an Oil and Gas Division which explored for and produced oil and gas in the United States and was exploring for oil and gas in Canada; 3) a Real Estate Division which owned two real estate properties and had a 25 percent interest in Charles Street Development Corp., which held title to the Blaustein Building located at Fayette and Charles Streets in Baltimore and held interests in other nearby parcels; and 4) the Manufacturing Division consisting of Atlas Sound which manufactured microphone stands, related accessories and a line of horn-type loudspeakers, and Kromex which manufactured kitchenware and gift ware. In addition to the operating divisions, ATAPCO owned sizeable blocks of common stock in other corporations, most of *176 which were not freely marketable. The relevant facts with regard to the operating divisions and the investments of ATAPCO are set forth in great detail in the findings of fact and no useful purpose would be served by restating them here. However, the following schedule identifies the components of the various operating divisions and the investments which are in controversy. AMERICAN TRADING AND
PRODUCTION
CORPORATION (ATAPCO)
AGREED VALUE
PETITIONERS' VALUATION DIVISION
7-8- 5
12-8-65
7-8-65
12-8-65
Marine
$4,299,899
$4,309,202
Oil & Gas
4,000,000
4,000,000
Real Estate
Charles Street
$270,000
$ 270,000
Dinkler Motor
otel (Atlanta) &
728,593
728,593
Americana
Apts.(Dallas)
Wilshire Properties
225,000
225,000
Manufacturing
kromex
4,150,000
4,150,000
Atlas Sound
2,660,000
3,100,000
Blocks of Stock in
other Corporations:
Indiana
59,689,000
58,438,000
New Jersey
8,933,000
9,144,000
Crown Central
3,052,000
3,384,000
Union Trust
1,050,000
1,110,000
U.S.Fidelity &
210,000
238,000
Guaranty
RESPONDENT'S VALUATION
VALUE FOUND DIVISION
7-8-65
12-8-65
7-8-65
12-8-65
Marine
$ 4,299,899
$ 4,309,202
Oil & Gas
4,000,000
4,000,000
Real Estate
Charles Street
$ 450,000
$ 450,000
450,000
450,000
Dinkler Motor Hotel
728,593
728,593
(Atlanta) & Americana
Apts. (Dallas)
Wilshire Properties
225,000
225,000
Manufacturing
Kromex
4,150,000
4,150,000
Atlas Sound
2,660,000
3,100,000
Blocks of Stock in
other Corporations:
Indiana
98,048,695
97,397,641
98,048,695
97,397,641 New Jersey
11,343,423
11,667,521
11,343,423
11,667,521
Crown Central
10,917,262
11,513,482
10,917,262
11,513,482
Union Trust
1,815,907
1,923,570
1,815,907
1,923,570
U.S.Fidelity &
262,797
299,054
262,797 299,054
Guaranty
*177 The parties produced well-qualified expert witnesses who testified at length as to their opinions of the fair market value of the class A and class B ATAPCO common stock owned by Dr. Thalheimer and Mrs. Blaustein on the dates of their respective deaths. Petitioners' expert was of the opinion that because ATAPCO was engaged in many diverse activities, it was appropriate to value the components separately. His valuations of the operating divisions are based on stipulated values of the components and the values he accorded the stock holdings in other corporations represent the amounts which could have been realized from the sale of such holdings on the respective dates of death. In arriving at the per share values of class A and class B common, petitioners' expert considered market prices and price earnings ratios for shares of publicly held corporations engaged in investments and operations regarded by him as comparable to ATAPCO from an investor's standpoint. Emphasizing that ATAPCO's 25 percent interest in Charles Street Development Corp. was a minority interest subject to certain restrictions on sale, petitioners' expert applied a 40 percent discount to the net asset value, *178 resulting in a value of $270,000 (60 percent of ATAPCO's 25 percent interest in the $1,800,000 stipulated value of Charles Street) on the respective dates of death of the decedents. Petitioners' expert valued ATAPCO's Standard Oil Co. (Indiana) holdings at $59,689,000 on July 8, 1965, and $58,438,000 on December 8, 1965. These valuations represent a 40 percent discount from the New York Stock Exchange (NYSE) closing prices on the valuation dates for blockage, distribution expenses, investment restrictions and capital gains tax liability. Similarly, allowing a discount of 5 percent from the closing prices on the NYSE on the respective valuation dates and the capital gains tax liability on disposition, petitioners' expert valued ATAPCO's 148,159 common shares of Standard Oil Co. (N.J.) on July 8, and December 8, 1965, at $8,933,000 and $9,144,000, respectively. ATAPCO's holdings in Crown Central were valued at $3,052,000 on July 8, 1965, and $3,384,000 on December 8, 1965, after discounting the prevailing market price on those dates by 40 percent for blockage, distribution expenses and capital gains tax liability. ATAPCO's ownership of 28,710 shares of capital stock of Union Trust *179 Co. of Maryland was valued at $1,050,000 and $1,110,000 on July 8 and December 8, 1965, respectively. These valuations take into account a 35 percent discount from the mean of the bid and asked prices on those dates and represent a discount for blockage, distribution expenses, investment restrictions and capital gains tax liability. Based on the mean of bid and asked prices less capital gains liability, ATAPCO's holdings in United States Fidelity & Guaranty Co. were valued at $210,000 on July 8, 1965, and $238,000 on December 8, 1965. Having valued the contested divisions (and components thereof) using the above-described assumptions and procedures, petitioners' expert computed the total value of ATAPCO's underlying assets by adding the values of the contested divisions (and components) to the agreed values of the uncontested divisions (and components). From this amount he deducted total unallocated liabilities and preferred stock valued at its redemption price in arriving at the net equity applicable to common stock. By dividing the latter amount by the combined outstanding shares of class A and class B common, petitioners' expert determined the net equity per share of such *180 stock to be $99.78 on July 8, 1965 and $98.26 on December 8, 1965. Having ascertained the net equity applicable to class A and class B common, petitioners' expert was of the opinion that these blocks of stock must be discounted because they represent unmarketable minority holdings in a privately held, closed corporation. After analyzing the relationship between the value of minority holdings and underlying asset values in five unregulated investment companies considered by him to be comparable to ATAPCO, petitioners' expert concluded that the class A voting shares would sell in the market at a discount of 44 percent from net asset value after provision for taxes on unrealized appreciation and the class B nonvoting shares should be discounted 46 percent. Reflecting these discounts, petitioners' expert was of the opinion that the fair market values of the class A and class B shares at the valuation dates were: Item
Estate of Alvin
Estate of Henrietta
Thalheimer
Blaustein Valuation Date
July 8, 1965
December 8, 1965
Shares of Class A Common
15,367
9,700
Fair Market Value: per share
$ 55.88
$ 55.03
TOTAL
$ 858,707.96
$ 533,791.00
Shares of Class B Common
28,745
29,100
Fair Market Value: per share
$ 53.88
$ 53.06
TOTAL
$1,548,780.60
$1,544,046.00
*181 To complement this opinion, petitioners' expert also constructed a hypothetical investment portfolio providing for direct ownership in shares of stock in Indiana, Jersey, Crown, Union Trust and U.S.F.&G. plus shares of stock in publicly traded corporations which were engaged in businesses similar to that of ATAPCO's several operating divisions. If instead of purchasing shares of ATAPCO, direct purchases had been made in proportion to the relative values of ATAPCO's interests in other corporations and its several operating divisions, the hypothetical portfolio would have provided the hypothetical investor a significantly higher dividend yield without jeopardizing any benefits to be derived from capital appreciation and the investor would enjoy a readily marketable liquid portfolio instead of a minority interest in a closely held corporation. While conceding that it is normal procedure to emphasize earnings or profits and dividends in appraisals of operating companies, respondent's expert was of the opinion that based on the company's history and its operating and financial policies and practices, ATAPCO more nearly resembled an investment company or fund that concentrated on growth *182 assets and deemphasized current earnings. Thus, in valuing the blocks of stock in issue, respondent's expert primarily disregarded earnings and dividends and relied more heavily on the underlying values of ATAPCO's net assets as the proper measure of the per share value of class A and class B common stock. Like petitioners' expert, respondent's expert submitted his values for the contested divisions (and components). However, unlike petitioners' expert, respondent's expert applied no discount to the net asset value of ATAPCO's minority holding in Charles Street Development Corp. thereby arriving at a value of $450,000 (25 percent interest in the $1,800,000 stipulated value of Charles Street). Similarly, respondent's expert valued ATAPCO's holdings in Indiana and Jersey by multiplying the number of such shares held times the means of high and low prices of such stock on the NYSE on July 8, and December 8, 1965, respectively, without applying any discount for blockage, distribution expenses, investment restrictions and capital gains tax. Respondent's expert valued ATAPCO's holdings in Union Trust and U.S.F.&G. by multiplying the number of shares held times the mean of the bid and *183 asked prices on July 8, and December 8, 1965, without applying any of the discounts previously discussed. Finally, after comparing Crown Central to eight other oil companies which he deemed comparable, respondent's expert concluded that current quoted prices on the American Stock Exchange substantially understated the value of ATAPCO's 48.8 percent holding of Crown Central common. Ignoring the fact that such a large block may command a premium, respondent's expert concluded that ATAPCO's holding of Crown Central common had a fair market value at least equal to book value on July 8, and December 8, 1965, absent any of the above-described discounts. Having valued the contested divisions (and components thereof) using the above-described assumptions and techniques, respondent's expert computed the total value of ATAPCO's underlying assets by adding the value of the contested divisions (and components) to the agreed values of the uncontested divisions (and components). From this amount he deducted total unallocated liabilities but initially neglected to deduct the preferred stock valued at its redemption price in arriving at net asset value per share of common. Allowing for this *184 error and dividing the net asset value by the combined outstanding shares of class A and class B common, respondent's expert determined the net asset value per share of such stock to be $169 on July 8, 1965, and $171 on December 8, 1965. After analyzing the relationship between the value of minority holdings and underlying asset values in nine publicly traded, regulated closed-end investment companies considered comparable to ATAPCO, respondent's expert concluded that the class A and class B common would sell at a discount of 5 percent from net asset value. Applying this 5 percent discount to the above-stated values results in a value of $160 for such stock on July 8, 1965, and $162 for such stock on December 8, 1965. Recognizing that ATAPCO common was not registered and had never been publicly traded, respondent's expert deemed it necessary to allow a further discount for what he called lack of marketability. A 9 percent discount was determined by simulating a registration and public offering and was comprised of 5 percent underwriting discounts and commissions, 2 percent sellers' expense of offering and 2 percent risk of market change. Applying this discount, the value of ATAPCO *185 common stock per respondent's expert was $145 on July 8, 1965, and $147 on December 8, 1965. Finally, respondent's expert discounted the nonvoting class B common by 5 percent in recognition that it may be less marketable than class A voting common. To summarize, respondent's expert valued ATAPCO common as follows: Item
Estate of Alvin
Estate of Henrietta
Thalheimer
Blaustein
Valuation Date
July 8, 1965
Dec. 8, 1965
Shares of Class A Common
15,367
9,700
Fair Market Value: per share
$ 145
$ 147
TOTAL
$2,228,215
$1,425,900
Shares of Class B Common
28,745
29,100
Fair Market Value: per share
$ 137
$ 139
TOTAL
$3,938,065
$4,044,900
A determination of the fair market value of closely-held stock is purely factual. Since valuation is not an exact science, no formula can be devised that will be generally applicable to all cases. The applicable statute, [1] respondent's regulations [2] and published rulings [3] and the reported cases offer no more than generalized guidelines. While we do not entirely agree with the appraisals offered by petitioners or respondent, the extensive financial data and expert appraisals establish a reasonable range *186 within which the fair market value of the stock must lie. We have found as an ultimate fact that ATAPCO class A common had a fair market value of $112 per share on July 8, 1965, and $113 per share on December 8, 1965, and that ATAPCO class B common had a fair market value of $106 per share on July 8, 1965, and $107 on December 8, 1965. In making our ultimate findings, we carefully considered all the evidence contained in the entire record including the stipulations of fact, the testimony of all witnesses presented by the parties and the numerous exhibits. We have analyzed all the evidence and given due weight to each item with proper regard for the fact that the burden of proof is on the petitioners. Among the factors considered in valuing the stock are the following: the organization and history of ATAPCO; its capital structure, financial condition, the nature of its business, its policies and the overall manner in which the business was operated; the number of outstanding shares of each class of ATAPCO's *187 capital stock and the identity of the shareholders; the fact that ATAPCO's shares were not listed on any exchange, were not dealt with through brokers or in over-the-counter trading, and had not been the subject of any sales; the character and amounts of ATAPCO's assets and liabilities; the book value and fair market value of its underlying assets; the amounts and trends of its annual earnings and prospects for future earnings; its dividend-paying history, and the prospects for future dividend payments; market prices of stock of comparable corporations; alternative investment possibilities; and all other factors which in our view or that of the witnesses were relevant and material to the value of such stock on the respective dates. In weighing the opinions of the expert witnesses, we considered the following: qualifications and demeanor; familiarity with ATAPCO, its underlying assets and comparable companies; the soundness of the valuation method employed; and skill in assembling, analyzing and weighing supporting data. Pursuant to making their appraisals, the expert witnesses for both parties initially endeavored to ascertain the underlying net asset value per share of class A *188 and class B common stock. [4] We have found that it was ATAPCO's policy to deemphasize earnings and dividends and to concentrate on growth and long-range capital appreciation. That being so, we agree that the underlying net asset value per share should be determined and that considerable weight should be given to the values thus obtained. See Hamm v. Commissioner, 325 F.2d 934 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court. However, in ascertaining the fair market value of the underlying assets of ATAPCO, petitioners' expert applied discounts to various assets for such factors as blockage, distribution expenses, investment restrictions, and/or capital gains tax.The record clearly shows that ATAPCO is a diverse, viable going concern and there is no evidence of a plan for its liquidation, voluntary or otherwise. Under these circumstances, the discounts applied by petitioners' expert in ascertaining underlying net asset value per share of class A and class B ATAPCO common stock were inappropriate and improper. Estate of Henry E. Huntington, 36 B.T.A. 698 (1937); Richardson v. Commissioner, 151 F.2d 102 (C.A. 2, 1946), affirming *189 a Memorandum Opinion of this Court; Estate of Frank A. Cruikshank, 9 T.C. 162 (1947). Thus, as set out in our findings of fact, we accept respondent's above-described valuation of ATAPCO's interests in Charles Street, Indiana, Jersey, Union Trust and U.S.F.&G. This leaves Crown as the sole remaining contested component. After considering all the evidence presented by both parties regarding the value of ATAPCO's effective controlling interest in Crown, we accept respondent's valuation because we were convinced that the agreed market price of Crown stock on the two valuations dates is not a true indicator of Crown's value because we are satisfied that on the two dates in question the Crown common was at least equal in value to the book value of Crown's assets as shown on its published balance sheets set out in our findings of fact. Having *190 found that fair market value of all contested divisions (and components), the next step is to add these amounts to the stipulated fair market values of the uncontested divisions (and components) to obtain the total fair market value of ATAPCO's underlying assets. The total fair market value of ATAPCO's underlying assets minus its total unallocated liabilities and preferred stock valued at its redemption price yields the underlying net asset value which must be divided by the total number of class A and class B ATAPCO common stock outstanding which yields the underlying net asset value per share of class A and class B ATAPCO common. Since we found respondent's valuation of the contested divisions (and components) to be the correct measure of their fair market value, the underlying net asset values must necessarily be the same as those computed by respondent. Having determined that the underlying net asset value of class A and class B ATAPCO common to be $169 on July 8, 1965, and $171 on December 8, 1965, we must next determine the proper discount to be applied against this underlying net asset value to arrive at the fair market value of the class A and class B ATAPCO common stock *191 for estate tax purposes. As previously discussed, after considering the relative advantages of alternative investments and after analyzing the relationship between the value of minority holdings and underlying asset values in five publicly traded, unregulated investment companies considered comparable to ATAPCO, petitioners' expert concluded that the class A voting common should be discounted 44 percent and that the class B nonvoting common should sell at a discount of 46 percent from the underlying net asset values per share to reflect the fair market value of decedents' unmarketable, minority interests in a privately held, closed corporation. After analyzing the relationship between the value of minority holdings and underlying asset values in some publicly traded, regulated closed-end investment companies deemed comparable to ATAPCO and allowing for lack of marketability, respondent's expert concluded that class A voting common stock should be allowed a total of 14 percent in discounts and that class B nonvoting stock should be allowed a total of 19 percent in discounts from the underlying net asset value per share. While we have found both experts' comparisons helpful in setting *192 a reasonable range within which the fair market value of ATAPCO's stock must lie, we think that such stock is much less comparable to that of the nine companies used in respondent's appraisal than he would have us believe. [5] Petitioners' comparables are not unassailable. Thus, we do not agree with either appraisal but, instead, believe the fair market value of the decedents' holdings in ATAPCO common stock falls well inside the two extremes advocated by the parties. Based on our careful consideration of the entire record, we find and hold that class A ATAPCO voting common stock should be discounted at 34 percent from the underlying net asset value per share on July 8, and December 8, 1965, and that class B ATAPCO nonvoting common should be discounted at 37 percent from the underlying net asset value per share on those dates. To summarize, we find and hold that the fair market values of the ATAPCO common stock are as follows: Item
Estate of Alvin
Estate of Henrietta Blaustein Thalheimer
Valuation Date
July 8, 1965
Dec. 8, 1965
Shares of Class A
15,367
9,700
Common
Fair Market
$ 112
$ 113
Value: per share
TOTAL
$1,721,104
$1,096,100
Shares of Class B
28,745
29,100
Common
Fair Market
$ 106
$ 107
Value: per share
TOTAL
$3,046,970
$3,113,700
*193 We believe these values represent the price that a willing buyer would have paid a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all the relevant facts. Decisions will be entered under Rule 155. Footnotes
1. Previously owned by Henrietta Blaustein but transferred to her estate by reason of death 12/8/65. ↩
2. Previously owned by Alvin Thalheimer but transferred to his estate by reason of death 7/8/65. ↩
1. Previously owned by Henrietta Blaustein but transferred to her estate by reason of death 12/8/65. ↩
2. Received 300 shares each from Ruth B. Rosenberg as a gift on 12/22/65. ↩
3. Received 297 shares from Ruth B. Rosenberg as a gift on 12/22/65. ↩
4. Gave 6,997 shares as a gift on 12/22/65. ↩
5. Received 1,400 shares from Ruth B. Rosenberg as a gift on 12/22/65. ↩
6. Received 2,600 shares from Ruth B. Rosenberg as a gift on 12/22/65. ↩
7. Previously owned by Alvin Thalheimer but transferred to his estate by reason of death 7/8/65. ↩
1. Previously owned by Henrietta Blaustein but transferred to her estate by reason of death 12/8/65. ↩
2. Previously owned by Alvin Thalheimer but transferred to his estate by reason of death 7/8/65. ↩
1. Previously owned by Henrietta Blaustein but transferred to her estate by reason of death 12/8/65. ↩
2. Previously owned by Alvin Thalheimer but transferred to his estate by reason of death 7/8/65. ↩
1. Sec. 2031, Internal Revenue Code of 1954↩. 2. Sec. 2031-2(f), Estate Tax Regulations. ↩
3. Rev. Rul. 59-60, 1959-1 C.B. 237↩. 4. We use the term "underlying net asset value per share of class A and class B ATAPCO common stock" to mean the fair market value of ATAPCO's total assets minus its total liabilities and preferred stock valued at its redemption price divided by the total number of shares of class A and class B ATAPCO common stock outstanding. ↩
5. Foremost among the distinctions are the ready marketability of the shares of those nine companies and their qualification, unlike ATAPCO, as regulated investment companies. See sec. 851- 855, I.R.C. 1954↩.